Filed 11/22/22  P. v. Barajas CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>ROBERTO BARAJAS,<br><br>     Defendant and Appellant. | 2d Crim. No. B314191<br>(Super. Ct. No. GA074425)<br>(Los Angeles County) |

Roberto Barajas appeals following a remand for resentencing.  In 2015, a jury convicted appellant of first-degree murder (Pen. Code,[1] §§ 187, subd. (a), 189) and found true allegations that the crime was committed for the benefit of a criminal street gang (§ 186.22, subds. (b)(1), (c)) and that a principal personally used and discharged a firearm causing great bodily injury or death (§ 12022.53, subd (d) & (e)(1)).  The trial court sentenced him to an aggregate term of 50 years to life in

---

[1] Unless otherwise stated, all statutory references are to the Penal Code.

state prison, consisting of 25 years to life for the murder plus a consecutive term of 25 years to life for the firearm enhancement. A ten-year gang enhancement was imposed and stayed pursuant to section 654.

We affirmed appellant's murder conviction on direct appeal, but remanded for the trial court to consider whether to exercise its discretion to strike appellant's firearm enhancement pursuant to Senate Bill No. 620, which had gone into effect while the appeal was pending. (*People v. Barajas* (May 29, 2019, No. B266151) [nonpub. opn.].) On remand, the trial court declined to strike the firearm enhancement but struck fines and fees that had been imposed against appellant.

While this appeal from the resentencing was pending, the Legislature enacted Assembly Bill No. 333 (AB 333), which changed the substantive requirements for proving the gang and firearm enhancement allegations found true in this case. Appellant contends, and the People correctly concede, that this new law applies to appellant because his judgment of conviction has yet to become final. The parties also agree that this new law compels the reversal of the subject enhancements because (1) there was no evidence that the predicate offenses offered to prove a pattern of criminal gang activity benefitted the gang in a manner that was more than merely reputational, and (2) a true finding on the gang enhancement allegation was an essential element of the firearm enhancement allegation. Accordingly, we shall reverse the true findings on both enhancement allegations and remand for further proceedings.

AB 333 also amended section 1109 to require that gang enhancement allegations be bifurcated at the defendant's request. Appellant contends that this new procedural law also

2

applies retroactively to his case and compels the reversal of his murder conviction. We reject this contention for lack of prejudice.[2]

## STATEMENT OF FACTS[3]

In 2007 or early 2008, victim Jennifer Ortega became romantically involved with Jaime Flores, a former member of the Villa Boys gang in Pasadena. Flores left the gang after he was sentenced to prison in 2006. Following his release from prison, he met Ortega and they began spending time together, having sex, and using drugs.

On April 16, 2008, Ortega and Rudy Martinez, a Pacoima gang member who was on parole, were arrested for possessing methamphetamine. Ortega initially acknowledged that the drugs she had been seen discarding were hers, but later told the police the drugs belonged to Martinez.

On August 7, Villa Boys member Eddie Solario sent a letter from prison to gang associate Debbie Garcia. The letter stated that a fellow prisoner had "paperwork" indicating that Ortega had blamed him for drugs found in her possession. Solario told Garcia that Ortega "knows you're not supposed to talk to cops. Now she has to live with that for the rest of her life. Don't forget to tell all them youngsters that. That way they don't make that mistake." In a letter dated August 17 that was never sent,

---

[2] Because we are reversing the firearm enhancement, appellant's claim that the trial court was unaware of its discretion to reduce the firearm enhancement allegation to a lesser enhancement (*People v. Tirado* (2022) 12 Cal.5th 688) is moot.

[3] The relevant facts are recited from our 2019 unpublished opinion. (*People v. Barajas, supra*, B266151.)

Garcia told Solario that "everyone in Pasa[dena] is looking for [Ortega] literally cuz she's fucking up and burning people."

Appellant was also a member of the Villa Boys gang. After Flores left the gang, appellant began leaving him threatening voicemail messages. In one message appellant told Flores, "We're going to get you guys." A few days prior to Ortega's murder, she and Flores saw appellant at an apartment building frequented by members of the Villa Boys. Appellant called Ortega and Flores "snitches" and told them "we're going to get you." Flores told Ortega to stay home with her family and avoid neighborhoods occupied by the Villa Boys.

At 2:00 a.m. on August 19, S.K. was in a building in Pomona when she saw appellant holding a silver semiautomatic handgun. S.K. watched appellant as he removed a magazine from the gun and reloaded it. She subsequently saw him leave in a PT Cruiser.

At about 9:45 p.m. that night, Aaron Gomez saw a black PT Cruiser enter the parking lot of a closed store in Pasadena. A short time later, Gomez heard two or three gunshots, then saw the PT Cruiser and a red car drive away. As the PT Cruiser was leaving, the front passenger door was opened. Guillermina Alvarez also heard the gunshots and saw a dark PT Cruiser speed away with its headlights off, followed by a red car.

Shortly after both cars left, Gomez and Alvarez heard a woman screaming and saw Ortega crawling out of the parking lot toward the sidewalk. She had been shot three times in the back and later died of her injuries.

The police recovered three expended casings from the scene of the shooting. Testing confirmed that the casings were all fired from the same 9-millimeter semiautomatic handgun. The casings

4

were placed onto a gauze pad in a clean and sterile scent transfer unit (STU) for possible dog trailing. The pad was subsequently placed in a heat-sealed bag for possible future use.

The police also obtained surveillance video from a gas station located at the intersection where the shooting occurred. The video shows the driver of a black PT Cruiser make a U-turn, turn off the car's headlights, and back into the parking lot where Ortega was shot less than two minutes later. After the shots were fired, the PT Cruiser is seen speeding away with the front passenger door slightly open. Shortly thereafter, another car is seen leaving the parking lot with its headlights off.

On August 28, Pasadena Police Detective William Broghamer saw a black PT Cruiser in the parking lot of a motel in Pasadena. After the detective determined that the PT Cruiser was registered to appellant he observed appellant, Villa Boys associate Maria Herrera, and three other females get into the vehicle. As appellant was about to drive away, Detective Broghamer stopped the vehicle and detained its occupants. Appellant was arrested and taken to the police station. That same night, the police searched appellant's bedroom and found a computer that had been used to access a news article about Ortega's murder. The computer had also recently been used to visit the website for Kelly Blue Book, which provides estimates regarding the resale value of used vehicles. On September 1, during a dog scent test conducted with the gauze pad in which the shell casings from the crime scene had been placed, the dog alerted to appellant.

Villa Boys associate Richshawna Whitten told the police she had heard prior to Ortega's murder that she had been "snitch[ing]" and identified appellant as the driver of a black PT

Cruiser.  Whitten initially denied being present when the shooting occurred but said she had heard that appellant and another Villa Boys member she knew only as "Mono" had committed the crime.  Whitten eventually admitted she was present when Ortega was killed.  She arrived at the scene in a red car along with Garcia, Herrera, and another female known as "Charms."  Garcia and Herrera had arranged for Ortega to meet them there.  Garcia and Herrera walked up to Ortega, grabbed her, and accused her of being a snitch.  Garcia and Herrera let go of Ortega as appellant drove up in his PT Cruiser.  Mono exited the front passenger seat and repeatedly shot Ortega.  Mono then got back into the PT Cruiser and appellant drove away.

Lisette Reyes, another Villa Boys associate, was interviewed by the police later the same day as Whitten's interview.  Prior to Ortega's murder, Reyes had seen appellant and two or three other young males physically assault Mono as punishment for bringing Ortega into the gang.  The day after the murder, appellant and Mono came to her house.  Both men were acting paranoid and appellant was holding a gray semiautomatic handgun.  They bragged about the gun, said they had to get rid of it because it was "hot," and asked Reyes to give them a screwdriver so they could take the gun apart.  Reyes subsequently identified appellant as the getaway driver and said that after the murder he brought a semiautomatic handgun to her house and disassembled it.

Detective Andrea Perez testified as the prosecution's gang expert.  The Villa Boys gang is a criminal street gang with approximately 100 documented members and six subsets, including the Krazy Boys.  The gang's primary activities include robberies, shootings, drug sales, and car theft.  Detective Perez

6

opined that appellant was a member of the Villa Boys. She reached that opinion based on photographs of appellant's tattoos and her review of departmental resources.

When presented with a hypothetical tracking the facts of the case, Detective Perez opined that Ortega was killed at the direction of the Villa Boys, in association with other members of the gang, and for the benefit of the gang. The detective opined that the crime benefitted the gang by instilling fear in the community and by sending the message that the gang was "not afraid to clean their own messes."

## DISCUSSION

## I.

Appellant contends that his gang and firearm enhancements must be reversed pursuant to AB 333, which went into effect while this appeal was pending. The People correctly concede the issue.

"[AB] 333 made the following changes to the law on gang enhancements: First, it narrowed the definition of a 'criminal street gang' to require that any gang be an 'ongoing, *organized* association or group of three or more persons.' (§ 186.22, subd. (f), italics added.) Second, whereas section 186.22, former subdivision (f) required only that a gang's members 'individually *or* collectively engage in' a pattern of criminal activity in order to constitute a 'criminal street gang,' [AB] 333 requires that any such pattern have been '*collectively* engage[d] in' by members of the gang. (§ 186.22, subd. (f), italics added.) Third, [AB] 333 also narrowed the definition of a 'pattern of criminal activity' by requiring that (1) the last offense used to show a pattern of criminal gang activity occurred within three years of the date that the currently charged offense is alleged to have been

7

committed; (2) the offenses were committed by two or more gang 'members,' as opposed to just 'persons'; (3) the offenses commonly benefitted a criminal street gang; and (4) the offenses establishing a pattern of gang activity must be ones other than the currently charged offense.  (§ 186.22, subd. (e)(1), (2).)  Fourth, [AB] 333 narrowed what it means for an offense to have commonly benefitted a street gang, requiring that any 'common benefit' be 'more than reputational.'  (§ 186.22, subd. (g).)" (*People v. Tran* (2022) 13 Cal.5th 1169, 1206 (*Tran*).)

The parties agree that this new law applies retroactively to appellant's case. (*Tran, supra,* 13 Cal.5th at p. 1206; *People v. Rodriguez* (2022) 75 Cal.App.5th 816, 822.)  The parties also agree, as do we, that in light of this new law both the gang enhancement and the firearm enhancement (an essential element of which is the true finding on the gang enhancement allegation) must be reversed for insufficient evidence.  We remand to give the People an opportunity to retry the gang and firearm enhancement allegations under the new law.  (*People v. Lopez* (2021) 73 Cal.App.5th 327, 345; *People v. Figueroa* (1993) 20 Cal.App.4th 65, 71-72, fn. 2; *People v. Sek* (2022) 74 Cal.App.5th 657, 669.)

## II.

As we have noted, AB 333 also amended section 1109 to provide that trials on gang enhancement allegations must be bifurcated at the defendant's request.  (§ 1109, subd. (a); *Tran, supra,* 13 Cal.5th at p. 1206.)  If the defendant makes such a request, "[t]he question of the defendant's guilt of the underlying offense shall be first determined,"  and "(2) If the defendant is found guilty of the underlying offense and there is [gang enhancement allegation], there shall be further proceedings to

8

the trier of fact on the question of the truth of the enhancement." (§ 1109, subd. (a).)

Appellant contends that this new law is an ameliorative change that should apply retroactively to his case under *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*), and that the error in declining to bifurcate the gang enhancement allegation compels the reversal of his murder conviction. The People respond that section 1109 is merely a procedural change that applies prospectively only and that any error in not bifurcating the proceedings was in any event harmless. We need not address whether the new law applies retroactively because we conclude it is not reasonably probable that appellant would have achieved a more favorable result had the gang enhancement allegation been bifurcated. (*Tran*, *supra*, 15 Cal.5th at pp. 1207-1208.)

Our Supreme Court has recognized that "evidence of gang membership is often relevant to, and admissible regarding, the charged offense. Evidence of the defendant's gang affiliation— including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime. [Citation.] To the extent the evidence supporting the gang enhancement would be admissible at a trial of guilt, any inference of prejudice would be dispelled . . . ." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049-1050.)

Here, evidence of appellant's gang membership and activities was relevant and admissible to prove his motive for participating in the murder. The People aptly note that "as appellant and his fellow gang member killed Ortega for being a

9

snitch, the vast majority of the gang evidence would have been admitted even if the gang allegation had been bifurcated under section 1109." Moreover, the independent evidence of appellant's guilt is strong. We also presume the jury understood and followed the court's instruction not to consider the gang-related evidence as proof that appellant was a person of bad character or had a criminal disposition. (CALCRIM No. 1403; *People v. Arauz* (2012) 210 Cal.App.4th 1394, 1404.) Accordingly, appellant suffered no prejudice due to the fact that the trial on the gang enhancement allegation was not bifurcated.

## DISPOSITION

The true findings on the section 186.22 gang enhancement allegation and the section 12022.53 firearm enhancement allegation are reversed. The sentence is vacated and the matter is remanded to the trial court for further proceedings. In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED.

CODY, J.\*

We concur:

GILBERT, P.J.          BALTODANO, J.

---

\* Judge of the Ventura Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California constitution.

10

Suzette Clover, Judge
Superior Court County of Los Angeles

_____

Gregory L. Rickard, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Wyatt E. Bloomfield, and Michael C. Keller, Deputy Attorneys General, for Plaintiff and Respondent.